# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAI CARE CENTERS OF MARYLAND I, LLC<br><br>       *Plaintiff*,<br><br>v.<br><br>U.S. OFFICE OF PERSONNEL MANAGEMENT<br><br>       *Defendant*. | Civil Action No. 18-3151 (TJK) |

## MEMORANDUM OPINION

Plaintiff provided outpatient renal dialysis services to nine beneficiaries of a federal-government-sponsored health plan. Now, it says, that plan's carrier unlawfully slashed its reimbursements to the plan's beneficiaries. Purporting to bring claims on those beneficiaries' behalf, Plaintiff sought reconsideration from the carrier and then review from the Office of Personnel Management, or OPM, the federal agency that oversees the plan. After failing both times, it sued OPM for review of its adjudications of those claims.

Both parties move for summary judgment. After reviewing the administrative record, the Court holds that Plaintiff is wrong about which document defines the plan's terms. As a result, Plaintiff lacks authorization to bring claims on seven of nine patients' behalf. But as for the other two patients, the Court finds that the agency failed to adequately explain the reduction in benefits. Thus, it will grant in part and deny in part both parties' motions for summary judgment, vacate as arbitrary and capricious two of the agency's adjudications, and remand to the agency for further proceedings consistent with this opinion.

## I.     Background

### A.     Legal Background

The Federal Employees Health Benefits Act ("FEHBA") empowers OPM to "contract with qualified carriers offering [health-benefits] plans." *See* 5 U.S.C. § 8902(a).  Such contracts must "contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable." *Id.* § 8902(d).  Once OPM enters such a contract, federal employees, annuitants, and certain family members may enroll in an approved plan. *See generally id.* §§ 8903, 8903a, 8905.  Enrollees must receive "a statement of benefits conveying information about the [p]lan's coverage and conditions." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 684 (2006); 5 U.S.C. § 8907(b).  Although enrollees are not parties to the contracts that define the plans, they are third-party beneficiaries and may enforce the plan's terms in that capacity. *See Christiansen v. Nat'l Sav. & Tr. Co.*, 683 F.2d 520, 530–33 (D.C. Cir. 1982).

OPM can require a carrier to pay for or provide health care if OPM finds that the relevant contract requires it. *See* 5 U.S.C. § 8902(j).  It may also "prescribe regulations necessary to carry out [the FEHBA]." *Id.* § 8913(a).  By regulation, OPM directs that claims should be "submitted initially to the carrier of the covered individual's health benefits plan." 5 C.F.R. § 890.105(a)(1).  If the carrier denies any part of the claim, the claimant may ask the carrier to reconsider. *Id.*  After exhausting that process, the claimant may appeal to OPM. *Id.*  Once OPM takes final action on the denial, the claimant may seek judicial review in federal district court. *See id.* § 890.107(c); 5 U.S.C. § 8912.

### B.     Factual Background

Plaintiff claims that OPM unlawfully refused to direct a carrier to pay health benefits due nine patients under an FEHBA plan for services Plaintiff provided in 2015. *See* ECF No. 1

¶¶ 164–74.  Thus, the Court will start with the terms of the relevant plan as it existed in 2015.[1]

### 1.    The Plan

OPM's predecessor agency authorized the plan by contract with Blue Cross Blue Shield Association in 1960.  *See* AR B373.  The FEHBA requires contract terms "of at least 1 year," 5 U.S.C. § 8902(a), and, in practice, OPM "negotiates benefits and rates with each plan annually," *see* AR B379.  Geographically defined Blue Cross Blue Shield affiliates underwrite and administer the plan "in their individual localities."  AR B379.  The affiliate relevant here is CareFirst Blue-Cross BlueShield.  *See* AR B1–5; AR G1–2.

The plan includes a preferred-provider organization, commonly called a PPO.  AR B387.  Thus, the plan divides facilities that provide health care into three categories.  First are preferred providers, which are in the organization and bill CareFirst directly.  *See id.*  Second are member facilities, which are not in the organization, but separately contract with CareFirst and so also bill CareFirst directly.  *See id.*  Third are nonmember facilities, which are neither in the organization nor have contracts with CareFirst and so must bill their patients for services.  *See* AR B388.  A patient enrolled in the plan may then file a claim with CareFirst for reimbursement.  *Id.*

Some covered services are subject to a plan allowance.  AR B401.  The allowance is the

---

[1] The Court is reviewing the actions of an administrative agency.  So unless otherwise noted, the facts recited are drawn from the administrative record ("AR").  Plaintiff's claim concerns the health benefits of nine individual patients whose names do not appear publicly on the docket, and the parties' joint appendix includes separately paginated records for each patient.  *See* ECF Nos. 50-1–50-11.  But for reasons the Court will explain, OPM has designated the records pertaining to only two of those patients, Patients B and G, as the administrative record.  *See generally* ECF No. 42.  Citations to the administrative record below preserve that pagination with letter references that correspond to the letters the parties have assigned to those patients.  Thus, a citation to AR B1 refers to page 1 of the administrative record for Patient B, available in the parties' joint appendix at ECF No. 50-2, and a citation to AR G1 refers to page 1 of the administrative record for Patient G, available in the parties' joint appendix at ECF Nos. 50-9, and so on.  For records pertaining to the remaining patients, to the limited extent the Court references those, it will cite the parties' joint appendix by ECF number and ECF pagination.

figure from which CareFirst calculates how much it will pay.  *See* AR B523.  For some services provided by nonmember facilities, the plan allowance is calculated by averaging the amount Blue Cross Blue Shield Association pays nationally for listed services.  *See* AR B523–24.  For other types of services, the plan allowance is simply "the billed amount."  *See id*.  Regardless, nonmember facilities need not "accept [the plan benefit] as payment in full," and the patient is "responsible for any difference between [CareFirst's] payment and the billed amount," subject to limited exceptions not relevant here.  *See* AR B524–25.

Thus, once a patient meets his annual deductible,[2] CareFirst pays a set portion of the plan allowance for covered services provided by nonmember facilities.  *See, e.g.*, AR B402.  The patient is then responsible for his coinsurance—the rest of the plan allowance—plus any difference between what the facility billed and the plan allowance.  *See id.*

Two relatively recent amendments to the plan contract are relevant here.  The first, effective as of 2001, allows carriers to implement "pilot programs" if approved by OPM.  *See* ECF No. 44-2 at 10.  It reads:

> Upon approval by the Contracting Officer, the Carrier may design and implement pilot programs in one or more local Plan areas that test the feasibility and examine the impact of various managed care initiatives.  The Carrier shall brief the Contracting Officer on a pilot program prior to its implementation, advise the Contracting Officer of the progress of the pilot program and provide a written evaluation at the conclusion of the pilot program.  The evaluation of the pilot program shall . . . assess the cost effectiveness, effect on quality of care and/or quality of life, and customer satisfaction, and recommend whether the pilot program should be continued or expanded.

*Id.*[3]  The second, effective as of 2014, restricts enrollees' ability to assign their benefits.  It reads:

---

[2] "A deductible is a fixed amount of covered expenses [the enrollee] must incur for certain covered services and supplies before [CareFirst] start[s] paying benefits for them."  *See* AR B400.

[3] No copy of that amendment appears in the administrative record.  Instead, OPM provided it as an exhibit to its briefing, ECF No. 44-2 at 10, along with a declaration of the plan's contracting

> [B]enefits provided under the contract are not assignable by the Member to any
> person without express written approval of the carrier, and in the absence of such
> approval, any such assignment shall be void.  Notwithstanding such approval, no
> assignment of benefits may be made in any case prior to the time that a valid claim
> for benefits arises.

AR B373–74.  Thus, both amendments were in effect in the 2015 plan year.

OPM approved a statement of plan benefits for 2015.  *See* AR B373–534.  That document describes itself as a "brochure" and says it relays the plan benefits "under [Blue Cross Blue Shield Association's] contract . . . with [OPM], as authorized by the [FEHBA]."  *See* AR B379.  But it also notes that enrollees are "entitled to the benefits" it describes and provides that "[n]o oral statement can modify . . . [its] benefits, limitations, and exclusions."  *Id.*  Further, the brochure explains that, if an enrollee appeals a claim denial to OPM, OPM "will determine if [CareFirst] correctly applied the terms of [the] contract."  AR B509.

Three provisions of the statement of plan benefits are most relevant to this case.  First, for renal dialysis at nonmember facilities, it says CareFirst should pay 65 percent of the plan allowance.  *See* AR B454.  Second, it describes the plan allowance for that service as "the billed amount (minus any amounts for noncovered services)."  AR B524.  Third, it tells enrollees they "may

---

officer, *see* ECF No. 44-1.  That officer avers that the language quoted above "appears in the Carrier contract that was effective . . . throughout the period relevant to this litigation."  ECF No. 44-1 at 2.  The Court's review in an APA case is usually confined to the administrative record, meaning that it could not consider "extra-record declarations."  *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013).  But this contractual provision is not extra-record in the relevant sense because the agency had that information "when it made its decision[s]."  *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).  The record contains many references to this contractual provision, which show that the agency partially based its decisions on it.  *See, e.g.*, AR B535 ("OPM[] approved the CareFirst dialysis pilot . . . to test the feasibility and analyze the significant financial impact to members . . . .  The change in reimbursement occurred through a pilot program that was approved by OPM.").  Considering the provision is thus appropriate as a supplement to the record.  *See Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (explaining "the difference between supplementing the record . . . and allowing the review of extra-record evidence").

designate an authorized representative to act on [their] behalf for filing a claim or to appeal claims decisions." AR B507. Also relevant is a provision it does *not* contain—the statement says nothing about pilot programs.

### 2. Plaintiff and Its Patients

Plaintiff is RAI Care Centers of Maryland I, LLC. It provides outpatient renal dialysis services. *See* AR B73. As relevant here, it claims to have provided dialysis to nine beneficiaries of the plan in 2015. ECF No. 1 ¶ 1. Those patients are anonymously identified by letter as patients A–I, although the parties know the patients' identities, which are also available in sealed portions of the administrative record. *See id.* at 1 n.1; Minute Order of Jan. 13, 2022. Critically, Plaintiff is a nonmember facility vis-à-vis the CareFirst plan, meaning that it has no contract with Blue Cross Blue Shield Association or CareFirst. *See* AR B74.

Plaintiff purports to be the assignee of each patient. For most patients, that is because the patient signed a form Plaintiff created, which is titled "Assignment of Benefits and Appointment of Personal Representative." *E.g.*, AR B95. Such forms were signed by the patient and, if applicable, the nonpatient policyholder—but not approved by CareFirst. *See id.* But for two patients, Patients B and G, Plaintiff later also got written consent for its lawyers to pursue their claims in a manner approved by CareFirst and OPM. *See* AR B370; AR G337.

### 3. The Parties' Dispute

Although this dispute is confined to services provided in 2015, Plaintiff's relationship with some patients began years earlier. For example, it treated Patient A starting in 2012. ECF No. 1 ¶ 27. For years, Plaintiff says, it received payments from CareFirst that matched its expectations: 65 percent of the billed amount for dialysis. *See id.* ¶¶ 32, 41, 50, 68, 77, 95.

That changed in 2015. In December 2014, CareFirst sent a letter to at least one of Plaintiff's facilities. *See* AR G344. The letter explained that, starting January 1, 2015, "all dialysis

services rendered to [plan beneficiaries] at [nonmember] facilities [would] be reimbursed accord-

ing to the CareFirst non-participating provider fee schedule." *Id.*  That is, the plan allowance

would no longer be based on "billed charges." *Id.*  The letter suggested that the facility should

consider "complet[ing] the CareFirst credentialing process" to become a member facility. *See id.*

As a result, CareFirst's reimbursements plummeted.  Take Patient B for instance.  Plaintiff

billed him for over $55,000 in March 2015.  *See* AR B1.  But CareFirst calculated the plan allow-

ance for those services as just below $7,500.  *See id.*  So it paid 65 percent of *those* amounts,

roughly $4,800.  *See id.*  That calculation left Patient B on the hook for over $50,000 for dialysis

provided in that month alone.  *See id.*  The story was similar for all nine patients for nearly all of

2015.[4]  *See* ECF No. 50-1 at 89 (Patient A); ECF No. 50-5 at 3–4 (Patient C); ECF No. 50-6 at

57–60 (Patient D); ECF No. 50-7 at 47 (Patient E); ECF No. 50-8 at 17 (Patient F); ECF No. 50-9

at 63–66 (Patient G); ECF No. 50-10 at 19 (Patient H); ECF No. 50-11 at 15 (Patient I).

For each patient, Plaintiff started by appealing to CareFirst.  *See* ECF No. 25-1 at 2–8.

CareFirst denied or disregarded those appeals, though it provided varying explanations.  The most

substantive such explanation was that a new "pilot program" began on January 1, 2015.  *See, e.g.*,

AR B4.  The pilot program, CareFirst noted, was "authorized by . . . [OPM] in accordance with

[its] contract [with] Blue Cross and Blue Shield Association.  *Id.*  Under the program, CareFirst

said it would reimburse nonmember facilities for dialysis based "on the Plan's allowance"—"no

longer . . . on billed charges." *Id.*  CareFirst provided no further explanation except by reference

to letters it had earlier sent to both the patients and to Plaintiff.  *See id.*

CareFirst also rejected several appeals on procedural grounds.  The ground most relevant

---

[4] CareFirst used the billed amount as the plan allowance for patient B in January and Feb-
ruary 2015, but it later called that calculation a mistake.  *See* AR B3.

here relates to Plaintiff's authorization to appeal the denied claims.  Sometimes, CareFirst asserted that it could not review Plaintiff's appeals because Plaintiff had no "authorization from the patient [that] allow[ed] [Plaintiff] to act on her behalf."  *See, e.g.*, AR G63.  That was despite Plaintiff's having provided a signed authorization form of its own creation.  *See* AR G53.  In other instances, CareFirst simply requested "a copy of the signed authorization."  *See e.g.*, ECF No. 50-11 at 19.  But again, that was after Plaintiff had already provided what it claimed was the patient's signed authorization.  *See, e.g.*, *id.* at 8.  CareFirst also once denied an appeal because, it said, it accepted only "medical necessity appeals" from nonmember facilities, and this did not qualify.  ECF No. 50-6 at 45.  Further, CareFirst repeatedly failed, at least in Plaintiff's judgment, to respond timely and substantively to Plaintiff's appeals.  *See* ECF No. 25-1 at 2–9.

Plaintiff then appealed to OPM.  From there, too, Plaintiff reports a litany of denials.  *See* ECF No. 25-1 at 2–9.  But what matters here is OPM's final word:  Regarding Patients B and G, for whom Plaintiff got signed authorizations on approved forms, OPM concluded that CareFirst paid the claims correctly.  AR B535–36; G338–39.  Like CareFirst, OPM explained that the patients were part of a dialysis "pilot program" that it approved.  AR B535; G338.  It referred to prior communications—sent to both the patients and Plaintiff—that augured the upcoming changes.  AR B535–36; G338–39.  It noted that, under the pilot program, CareFirst was to pay 65 percent of the relevant plan allowance, not the billed amount.  AR B536; G339.  Thus, and without further explanation, it "determined the services were paid appropriately."  *Id.*

As for the remaining patients, OPM directed Plaintiff to get the patients' signatures on approved forms.  ECF No. 37-1 at 19.  Plaintiff never did because, as it explains, those patients "are deceased or no longer treating with RAI."  ECF No. 39 at 19.  So OPM refused to "adjudicate the disputed claims."  ECF No. 37-1 at 19.

### C.  Procedural History

Plaintiff sued before receiving what the Court characterized above as OPM's final word. *See generally* ECF No. 1.  Plaintiff pleaded one claim, alleging that OPM violated the FEHBA and its implementing regulations by failing to pay it, as the patients' assignee, 65 percent of the billed amounts for dialysis it provided plan enrollees in 2015.  *See* ECF No. 1 ¶¶ 164–74.  OPM moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6).  ECF No. 12.  That motion mainly challenged Plaintiff's ability to bring the claims.  OPM claimed that FEHBA regulations do not permit an assignee to seek judicial review of an OPM decision and that, as a waiver of sovereign immunity, the FEHBA should be construed strictly on that point.  *See* ECF No. 12-1 at 6–9, 17–18. Alternatively, OPM argued that Plaintiff had insufficiently alleged details about the assignments, *id.* at 9–11; that it had failed to show constitutional redressability, *id.* at 11–13; and that Plaintiff's complaint should be dismissed on the merits for failure to exhaust administrative remedies.  *See id.* at 13–17.

The Court denied OPM's motion.  ECF No. 20.  It concluded that neither the FEHBA nor its implementing regulations prohibit an assignee from seeking judicial review of an OPM decision.  *See id.* at 8–10.  It also found that Plaintiff had plausibly pleaded that it was the patients' assignee via signed, written authorizations.  *See id.* at 3–5.  As a result, the Court rejected OPM's standing and sovereign-immunity challenges.  *See id.* at 6–8.  Finally, the Court held that Plaintiff did not need to plead further details about its exhaustion efforts.  *See id.* at 10–12.

OPM then moved to stay the case and remand the claims to OPM for further adjudication. *See* ECF Nos. 23–24.  The Court agreed, noting that OPM had represented it could "render final agency decisions" about claims for which Plaintiff could produce "valid, written [patient] authorizations."  Min. Order of Mar. 28, 2021 (quotations omitted).  OPM later told the Court it had finally adjudicated Plaintiff's claims related to Patients B and G and that it was "prepared to defend

its decision not to adjudicate the claims related to [the remaining patients]."  ECF No. 33 at 3.

Accordingly, both parties move for summary judgment.  *See* ECF Nos. 37, 39.

Plaintiff also moves to supplement the administrative record.  ECF No. 38.  OPM's position is that there is no administrative record for any patient other than Patients B and G because "there was no final agency decision" on those claims.  ECF No. 42 at 5.  Plaintiff maintains that OPM's refusal to decide those claims is based on an "erroneous technicality," ECF No. 38 at 6, and so it wishes to add to the administrative record "[a]ll records" related to those patients' claims, *see id.* at 10 (emphasis omitted).  It also wishes to add further "appeal correspondence and patient records related to" Patients B's and G's claims.  *Id.* at 13.  OPM opposes, arguing that those additional materials are irrelevant and duplicative.  *See* ECF No. 42 at 10–23.

## II.    Legal Standard

Plaintiff seeks judicial review of OPM's adjudication of health-benefits claims under 5 U.S.C. § 8912 and 5 C.F.R. § 890.107(c).  Such review "is limited to the deferential standard of review prescribed in the [Administrative Procedure Act]" ("APA").  *Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37, 42 (D.D.C. 1996); *see also Dyer v. Blue Cross Blue Shield Ass'n, Inc.* (*In re Bolden*), 848 F.2d 201, 205 (D.C. Cir. 1988); *Bryan v. OPM*, 165 F.3d 1315, 1319 (10th Cir. 1999).  "[U]nder the APA," this Court "sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  That is, the Court has no factfinding role because the case presents "a question of law."  *See id.*  It must ask "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).

### III.    Analysis

In support of its one-count complaint, Plaintiff argues that OPM violated the FEHBA and its implementing regulations by failing to pay it, as the patients' assignee, 65 percent of the billed amounts for dialysis it provided plan enrollees in 2015. *See* ECF No. 1 ¶¶ 164–74. Its argument goes like this:  OPM is bound by the terms of the 2015 statement of plan benefits, which control over terms found elsewhere. *See* ECF No. 39 at 27–29.  The meaning of those terms is a legal question, so the Court should review OPM's interpretations de novo. *See id.* at 21–22.  Those terms (and FEHBA regulations) permit a plan enrollee to assign her benefits and an assignee to pursue claims. *See id.* at 23–27.  Here, all nine patients validly assigned Plaintiff their plan benefits. *Id.* at 23, 23 n.6.  The brochure's terms required CareFirst to pay 65 percent of billed charges for dialysis in 2015—and say nothing about any pilot program. *See id.* at 29–34.  In the alternative, Plaintiff says OPM's determination that the claims were paid correctly according to the pilot program lacks record support, *id.* at 34–35, that the program violates "federal anti-discrimination laws," *id.* at 35–36, and that, "as a matter of policy," giving the program effect would harm patients, *id.* at 36–37.

For its part, OPM asserts that the carrier contract's terms control over the brochure—which in any event incorporates the carrier contract. *See* ECF No. 44 at 11.  So it points to two contractual provisions to support its adjudications.  First, under the contractual amendment restricting benefits assignments made "without express written approval of the carrier" and voiding assignments made otherwise, AR B373–74, it argues that Plaintiff is the assignee of only Patients B and G, the only two patients to execute an assignment via an approved form. *See* ECF No. 37-1 at 23–26.  Second, under the contractual amendment allowing carriers, with OPM's approval, to "design and implement pilot programs," ECF No. 44-2 at 10, it argues that Patients B's and G's claims were paid appropriately at 65 percent of the plan allowance set by an applicable pilot program, ECF No. 44

at 10–14.

As explained below, the Court holds, first, that the carrier contract's terms control, and second, that it need not decide whether it must defer to OPM's interpretations of those terms because, in one instance, the applicable terms are unambiguous, and in the other instance, OPM did not adequately explain its interpretation.  For these reasons, the Court will vacate OPM's adjudications as to Patients B and G because those decisions were arbitrary and capricious, and remand those claims to OPM for further proceedings.  But it will grant summary judgment for Defendant as to all the other patients because Plaintiff lacks authorization to bring claims on their behalf.

### A.      The Carrier Contract's Terms Control—Not the Statement of Plan Benefits

The first question the Court must decide is whether to give primacy to the carrier contract between OPM and Blue Cross Blue Shield Association or to the 2015 statement of plan benefits. That question matters because the documents differ (at least in specificity) in two relevant ways. First, the statement of plan benefits notes that an enrollee may "designate an authorized representative to act on [her] behalf for filing a claim or to appeal claims decisions."  AR B507.  The carrier contract, as amended, purports to limit *how* an enrollee may designate an authorized representative. *See* AR B373–74.  Second, the statement of plan benefits says nothing about pilot programs.  *See* AR B375–534.  But the carrier contract, as amended, authorizes them and implies that they might modify, for affected enrollees, broadly applicable plan terms.  *See* ECF No. 44-2 at 10 (noting that a pilot program might affect an enrollee's "quality of care," "quality of life, and customer satisfaction").

OPM has explained why those documents can differ, at least on the second point.  It says the statement of plan benefits is sent to all enrollees, "who reside nationally and internationally."  AR B535.  But a pilot program, by definition, applies only to designated "local Plan areas."  ECF No. 44-2 at 10.  After all, the purpose of such programs is to "test the feasibility" of some attribute

before applying it to all enrollees.  *See id.*  For that reason, OPM says carriers participating in pilot programs notify "affected members and providers" of the changed terms directly.  AR B535.  That is what happened here.  *See, e.g.*, AR G341–42, 344.

Whatever the explanation, the parties agree that the relationship between the carrier contract and the statement of plan benefits is critical.  Plaintiff calls it "axiomatic" that the terms in the statement of plan benefits control.  *See* ECF No. 39 at 31.  OPM focuses on the contractual language and claims that, in any event, the statement of plan benefits incorporates the carrier contract's terms.  *See* ECF No. 44 at 12–14.  Ultimately, the Court agrees with OPM that the carrier contract's terms are what matter.

Plaintiff seems to argue that the statement of plan benefits is itself a contract, apparently between the enrollees and CareFirst (or Blue Cross Blue Shield Association).  It cites cases that explain that a private insurance policy "is a contract between the insured and the insurer."  *See* ECF No. 39 at 27–28 (quoting *Burk & Reedy, LLP v. Am. Guarantee & Liab. Ins. Co.*, 89 F. Supp. 3d 1, 8 (D.D.C. 2015)).  It also suggests that under ERISA[5]—a context it says is analogous—the terms of "summary plan descriptions" control.  *See id.* at 29.[6]  Thus, it describes the pilot program as "extra-contractual" even though the carrier contract authorizes pilot programs.  *See id.* at 30.  And it cites contract principles, such as the parol evidence rule, to argue that no combination of OPM, Blue Cross Blue Shield Association, or CareFirst could change the terms of the statement of plan benefits "unilateral[ly]," even if done by "written notice."  *Id.* at 30–34.

But the statement of plan benefits is not a contract.  For starters, it is settled law in this

---

[5] The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.

[6] At least, that is the only way Plaintiff's ERISA argument could be analogous to this question.  As the Court explains further below, Plaintiff's motion is not clear on this point.

Circuit that the carrier contract "is a third party beneficiary contract." *Christiansen*, 683 F.2d at 533; *see also Bridges*, 935 F. Supp. at 44. Of course, a third-party beneficiary is not a party to the underlying contract. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631–32 (2009). A third-party beneficiary's rights and obligations are those conferred by the underlying contract. *See Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 632 (D.C. Cir. 1989) (noting that a third-party beneficiary "steps into the shoes of the promisee"). And they "may enforce the duties arising under it." *Ashton v. Pierce*, 716 F.2d 56, 66 (D.C. Cir. 1983). Because plan enrollees can enforce the carrier contract, which has terms almost identical (usually completely identical) to those of the statement of plan benefits, there is no obvious reason to construe the statement as a separate contract that enrollees may enforce as a party.

The statement of plan benefits also does not suggest that it is a contract. It calls itself a "brochure" that merely "describes the benefits of" the carrier "contract." AR B379. Plaintiff's best in-document evidence for treating the statement of plan benefits as a contract is its statement that it is the "official statement of benefits," which "[n]o oral statement can modify or otherwise affect." *Id.*; *see also* ECF No. 45 at 5–6, 9. But that language appears on the same page of the document as its self-description as a "brochure . . . under" the carrier contract. AR B379. And the description "official statement of benefits" is consistent with a communication of benefits created elsewhere; contractual benefits need communication because the carrier contract's terms are not public. *See generally* ECF No. 44-2. Besides, the note precluding oral modifications says nothing about the source of the benefits—obviously, a change to the underlying contract is not an oral modification. Thus, the statement of plan benefits itself does not further Plaintiff's argument.

The FEHBA confirms the Court's conclusion. Its first substantive provision gives OPM contracting authority with plan carriers. 5 U.S.C. § 8902(a). It also requires contracts to contain

certain detailed provisions and forbids them from containing others.  *See id.* § 8902(c)–(d), (g), (j), (n)–(p).  And it provides that some contractual terms "supersede and preempt" state and local law. *Id.* § 8902(m)(1).  In other words, the FEHBA emphasizes carrier contracts' importance, regulates their contents with particularity, and gives them the force of law.

As Plaintiff acknowledges, ECF No. 45 at 5–6, the statement of plan benefits falls into a different statutory category.  It originates from 5 U.S.C. § 8907(b), which directs the issuance of "an appropriate document"—phrasing that differs from Section 8902's "contract"—"setting forth *or summarizing*" key information about the plan, *id.* § 8907(b) (emphasis added).  That information, due to "[e]ach enrollee in a health benefits plan," includes the "benefits . . . to which the enrollee . . . [is] entitled *thereunder.*"  *Id.* (emphasis added).  The phrase "or summarizing" helps clarify the document's role because to summarize something is to relate and condense it, not to create it anew.[7]  The final term, "thereunder," is also significant because the term "health benefits plan" is defined by the FEHBA.  It "means a group insurance policy or contract . . . or similar group arrangement provided by a carrier for the purpose of providing, paying for, or reimbursing expenses for health services."  *Id.* § 8901(6) (emphasis added).  So the term "thereunder," whose referent is the "health benefit plan," helps clarify the source of an enrollee's entitlement: the contract creating the policy.

Thus, the statutory evidence of the relationship between the carrier contract and the statement of plan benefits mirrors what the latter says.  It merely "describes the benefits" the contract creates.  *See* AR B379.[8]

---

[7] A summary is "[a] shortened statement or account which gives only the main or essential points of something, not the details."  Oxford English Dictionary (2d ed. 1989); *see also id.* (July 2023 update), https://www.oed.com/dictionary/summary_n?tab=meaning_and_use#19938986.

[8] The Court acknowledges that another district court has reached the opposite conclusion.

Plaintiff cannot rely on ERISA cases to argue otherwise.  For starters, it says courts "routinely" use ERISA precedent in analyzing FEHBA issues.  ECF No. 39 at 29 n.8.  But its support for that proposition is less sweeping.[9]  And other courts have not shared Plaintiff's enthusiasm for conflating the two statutes.  *E.g.*, *Bridges*, 935 F. Supp. at 44 ("[C]ases arising under ERISA law are of no moment in the context of the FEHBA."); *Cal. Spine & Neurosurgery Inst. v. Nat'l Ass'n of Letter Carriers Health Benefit Plan*, 548 F. Supp. 3d 934, 943 (N.D. Cal. 2021) ("[I]t is not at all clear that cases construing ERISA's provision can be mechanically applied in the FEHBA context, or vice versa.").  Contrary to Plaintiff's assertion, if there is a relevant "routine" practice in federal courts, it is ensuring that provisions of ERISA and the FEHBA are at least very similar before treating their caselaw as fungible.[10]

---

*See Blue Cross & Blue Shield Ass'n v. Cox*, No. 1:07-CV-533 (CAP), 2009 WL 10670188, at *4 (N.D. Ga. Sept. 23, 2009) ("[T]he Plan's Brochure represents the sole contract that [the enrollee] agreed to and under which he is obligated."), *vacated as moot*, 403 F. App'x 417 (11th Cir. 2010). That court, however, cited no authority for its conclusion.  *See id.* at *3–4.  Moreover, it rejected the argument that the enrollee was a third-party beneficiary of the carrier contract because that theory—asserted there by the plaintiff—was not "specifically included in the complaint."  *Id.* at *3.  Here, OPM, the defendant, properly asserted that point in its motion for summary judgment. ECF No. 37-1 at 6.  And as noted above, it is settled law in this jurisdiction.  *Christiansen*, 683 F.2d at 533; *see also Bridges*, 935 F. Supp. at 44.

[9] *Viz. Hayes v. Prudential Ins. Co. of Am.*, 819 F.2d 921, 926 (9th Cir. 1987) (relying on an ERISA case because ERISA contains a particular clause similar to the FEHBA clause at issue); *In re LymeCare, Inc.*, 301 B.R. 662, 671 n.5 (Bankr. D.N.J. 2003) (noting in passing that "[a]nalogy is sometimes drawn" between the two statutes); *but see Berry v. Blue Cross of Wash. & Alaska*, 815 F. Supp. 359, 363–64 (W.D. Wash. 1993) (explicitly relying on ERISA cases in analyzing a similar issue despite acknowledging that the "FEHBA differs from ERISA").  As explained further below, the Court cannot adopt the *Berry* court's analysis in any event because it has been abrogated by a later Supreme Court decision.

[10] *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 299 n.2 (1st Cir. 2005) (calling the statutory provisions "nearly identical"); *Goepel v. Nat'l Postal Mail Handlers Union*, 36 F.3d 306, 312–13 (3d Cir. 1994) (concluding that an ERISA doctrine "does not apply" in the FEHBA context after concluding that the comparable provisions are materially different); *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 904 (5th Cir. 2023) (pointing out that the two statutes use "exactly the same language"); *Botsford v. Blue Cross & Blue Shield of Mont., Inc.*,

ERISA and the FEHBA both provide detailed instructions about the documents that create plans, *see* 5 U.S.C. § 8902(c)–(d), (g), (j), (n)–(p); 29 U.S.C. § 1102, and the documents that inform enrollees *about* those plans, *see* 5 U.S.C. § 8907; 29 U.S.C. § 1022.  But even a cursory comparison of those regimes reveals differences that give the Court pause before importing the caselaw interpreting one into an analysis of the other.  For example, ERISA uses far more detail in describing the summary plan document than does the FEHBA in describing the comparable "appropriate document," and ERISA requires its informational documents to "be sufficiently accurate and comprehensive to reasonably apprise [average plan] participants and beneficiaries of their rights and obligations," while the FEHBA contains no such explicit requirement.  *Compare* 5 U.S.C. § 8907(b) *with* 29 U.S.C. § 1022(a).

In any event, whether to rely on ERISA caselaw here is academic, for ERISA caselaw does not support Plaintiff's position.  As the Court has just hinted, ERISA is like the FEHBA in one very broad respect: It provides for two types of documents that serve functions analogous to the carrier contract and the statement of plan benefits.  The first type creates the plan; ERISA requires plan creation via "a written instrument."  29 U.S.C. § 1102(a)(1).  That document thus contains "the written terms of the plan."  *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013).  The second type explains the plan; ERISA requires that enrollees get a "summary plan description" that must contain enumerated plan information.  *See* 29 U.S.C. § 1022.  It is a "plain-language document upon which plan participants may rely to understand their benefits."  *Pettaway*

---

314 F.3d 390, 393–94 (9th Cir. 2002) ("refer[ring] to ERISA and FEHBA cases interchangeably" after concluding that, as amended, an FEHBA provision "closely resembles" an ERISA provision); *Cal. Spine & Neurosurgery Inst.*, 548 F. Supp. 3d at 943–45 (concluding that "differences" between provisions of the two statutes "cast doubt on the notion that case law interpreting [those] provisions can be applied interchangeably").

*v. Tchrs. Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 433 (D.C. Cir. 2011).

Plaintiff's motion elides that distinction. Its ERISA argument seeks to establish that "plan terms control and must be strictly followed." *See* ECF No. 39 at 29 (emphasis omitted). But that precept ignores the relevant question: What *are* the binding plan terms—do they come from the plan itself or the summary plan description? The cases Plaintiff cites shed no light on the question at hand. *Sprague v. General Motors Corp.*, for instance, says only that *both* documents collectively govern—not oral statements or other written communications—and takes no position on conflicts between the two. 133 F.3d 388, 402–03 (6th Cir. 1998). The other two cases it cites do not mention summary plan documents in the relevant analysis and so reveal nothing here.[11]

But the Supreme Court *has* answered that question. In *CIGNA Corp. v. Amara*, the United States argued that "the terms of the summaries are terms of the plan." 563 U.S. 421, 435–37 (2011). The Court rejected that view. It observed that a summary plan description must notify plan beneficiaries "of their rights and obligations 'under the plan.'" *Id.* at 437 (quoting 29 U.S.C. § 1022(a)). That language, it reasoned, means "the information *about* the plan provided by those

---

[11] *Coleman v. Nationwide Life Insurance Co.*, as Plaintiff explains, noted the "statutory emphasis on adherence to the written terms of ERISA plans." 969 F.2d 54, 59 (4th Cir. 1992); *see also* ECF No. 39 at 29. But that court was speaking only of Section 1102(a)(1)'s "written instrument." *See Coleman*, 969 F.2d at 59. And it, like the *Sprague* court, was addressing the argument that an oral promise should govern over written plan documents. *See id.* at 58–60. There was no purported conflict between the plan and the summary plan document; the plaintiff separately asserted that the insurer had failed to "provide an adequate summary plan description." *Id.* at 62.

Similarly, *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan* emphasized that plan terms reign. 555 U.S. 285, 299–304 (2009). But the argument the Supreme Court rejected was that a "plan administrator was required to honor [a] waiver" created by a divorce decree not given effect by the statute—in other words, not a plan document by any definition. *See id.* at 288, 299. In that context, the Court held that the need to "giv[e] a plan participant a clear set of instructions," along with ERISA's statutory directives, favored considering only "the plan documents." *Id.* at 300–01. So again, the Court did not consider a conflict *among* plan documents. It mentioned only in passing that a "summary plan description" is a plan document. *Id.* at 304.

disclosures is not itself *part* of the plan." *Id.* The Court also explained that the purpose of a summary plan description is "clear, simple communication." *Id.* But if the summary's terms preempt the plan's terms, plan administrators might "sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers." *Id.* Thus, the Court held that summary plan descriptions "do not themselves constitute the *terms* of the plan." *Id.* at 438. In other words, where plan terms and summary-plan-description terms conflict, plan terms control. *Lipker v. AK Steel Corp.*, 698 F.3d 923, 931 n.4 (6th Cir. 2012); *see also Foster v. Sedgwick Claims Mgmt. Servs., Inc.*, 842 F.3d 721, 731 (D.C. Cir. 2016) (noting that, after *CIGNA*, a summary plan description "is not itself legally binding").[12]

The potential analogy to the FEBHA is plain. As the Court has explained, OPM's carrier

---

[12] Before *CIGNA*, several courts had held the opposite—that summary-plan-description terms control over plan terms. *See, e.g.*, *Germany v. Operating Eng'rs Tr. Fund of Wash., D.C.*, 789 F. Supp. 1165, 1171 (D.D.C. 1992) ("[W]hen there is a discrepancy between a "plan summary" as defined in § 1022, and other documents which purport to define the rights and obligations of plan participant . . . the summary plan description controls."); *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907–08 (2d Cir. 1990) ("To allow [a] [p]lan to contain different terms that supersede the terms of the [summary plan document] would defeat the purpose of providing the employees with summaries."); *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991) ("[I]f there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern."); *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988) ("[S]tatements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern."); *McKnight v. S. Life & Health Ins. Co.*, 758 F.2d 1566, 1570 (11th Cir. 1985) ("It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan."). It was in that context that the *Berry* court held that "a plan summary controls if it conflicts with a FEHBA plan." *See* 815 F. Supp. at 362–64 (citing *Hansen*, *Edwards*, and *McKnight*). But those holdings—as at least two of those circuits have since recognized—did not survive *CIGNA*. *See Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016) (recognizing that *CIGNA* abrogated *Hansen*); *Bd. of Trs. v. Moore*, 800 F.3d 214, 219 (6th Cir. 2015) (recognizing that *CIGNA* abrogated *Edwards*); *see also Trs. of N.Y. State Nurses Ass'n Pension Plan v. White Oak Global Advisors LLC*, 102 F.4th 572, 603 (2d Cir. 2024) ("In [*CIGNA*], the [Supreme] Court addressed an attempt by plan beneficiaries to enforce a summary plan description issued by the plan . . . . The Court concluded that such a document did not 'constitute the terms of the plan' that could be enforced under ERISA § 502(a)(1)(b)." (quoting *CIGNA*, 536 U.S. at 438)).

contract with Blue Cross Blue Shield Association established the plan. *Empire Healthchoice*, 547 U.S. at 684. Separately, enrollees must get "an appropriate document setting forth or summarizing" information about the plan, including the "services or benefits . . . to which [they] . . . are entitled thereunder." *See* 5 U.S.C. § 8907(b). So like ERISA summary plan descriptions, FEHBA "appropriate document[s]" inform beneficiaries about a plan but do not constitute part of the terms of the plan. *Cf. CIGNA Corp.*, 563 U.S. at 438. Thus, if the Court were to rely on ERISA cases, those cases would also favor resolving conflicts between carrier-contract terms and informational-document terms in favor of the carrier contract. *Cf. id.* at 437–38.

But to be clear, the Court does not rely on ERISA cases to reach its conclusion. Instead, it simply need not turn to ERISA caselaw, *see* ECF No. 39 at 29, 32, because doing so would not advance Plaintiff's position. It would simply confirm the conclusions the Court independently reaches based on its above analysis of the FEHBA and the 2015 statement of plan benefits: that (1) the statement of plan benefits is not a contract; and (2) the terms of the carrier contract control this dispute.

Still, those conclusions should not be taken to mean that a statement of plan benefits may materially deviate from the underlying carrier contract without violating the FEHBA. It is at least arguable that a plan enrollee who receives a statement of plan benefits that appears to promise her benefits to which she is not entitled under the carrier contract has not received "an appropriate document setting forth or summarizing" two of the statutory requirements: the "services or benefits, including maximums, limitations, and exclusions, to which [she is] . . . entitled thereunder" and the "principal provisions of the plan affecting [her]." *See* 5 U.S.C. § 8907(b)(1), (3). In other words, it may be that limitations and exclusions found in a carrier contract but not a statement of plan benefits amount to a failure of notice.

But that is not Plaintiff's argument.  Plaintiff acknowledges that the patients received notice of their inclusion in the pilot program by "letters [and] phone calls" and says, "contracts cannot be modified through a unilateral notice."  *See* ECF No. 39 at 30–31; *see also* AR B335–36 (letter to Patient B); AR B341 (follow-up letter to Patient B); AR B343 (letter to Plaintiff); AR G341–42 (letter to Patient G); AR G344 (letter to Plaintiff).  But the notion that a letter or a phone call cannot amend plan terms is different from the idea that those communications do not satisfy statutory notice requirements.[13]  For one thing, such claims might justify different remedies.  In any event, the Court's role is to resolve this dispute as the parties have presented it.  *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020).  Because the Court has rejected Plaintiff's argument that the statement of plan benefits was a contract, it has by extension rejected Plaintiff's argument that the notice provided could not amend that supposed contract.  *See* ECF No. 39 at 30–34; ECF No. 45 at 8–10; ECF No. 46 at 7–8.

So as for Plaintiff's remaining arguments about the nature of the contract, Plaintiff is hoist by its own petard.  Plaintiff insists "that plan terms control and must be strictly followed."  ECF No. 39 at 29 (emphasis omitted).  And it says benefits information "referenced in a separate notice

---

[13] At one point in Plaintiff's second of three relevant briefs, Plaintiff says the letters and phone calls did "not comply with FEHBA notice requirements."  ECF No. 45 at 8–10 (citing 5 U.S.C. § 8907(b)(1)–(3).  Plaintiff there says the "notices are vague and tentative; they do not provide any specificity in the change in benefit terms."  *See id.* at 9.  But as in Plaintiff's other filings, its overall point was that "[p]lan terms may not be amended through a separate written or oral notice."  *See id.* at 8.  If Plaintiff meant to assert as a separate claim that the letters and calls did not provide adequate notice under 5 U.S.C. § 8907(b) and that the Court should enter judgment in its favor for that reason alone, it forfeited that argument for two reasons.  First, it did not make that argument in its opening brief.  The Court need not consider arguments raised outside of an opening brief. *Garcia v. Stewart*, 531 F. Supp. 3d 194, 208 n.4 (D.D.C. 2021).  Second, its argument is conclusory—it does not attempt to analyze the statute, explain what level of notice is required, and compare the information in the letters and phone calls to those requirements.  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

is insufficient to abrogate them." *See id.* at 31.  In those limited respects, the Court agrees.  "[F]ederal common law pertaining to the construction of contracts" applies to the plan.  *Transitional Learning Cmty. at Galveston, Inc. v. OPM*, 220 F.3d 427, 431 (5th Cir. 2000).  Under federal common law, the Court may not consider evidence extrinsic to a fully integrated written agreement.  *See Bowden v. United States*, 106 F.3d 433, 439–40 (D.C. Cir. 1997).  But that principle applies to the carrier contract—not the statement of plan benefits.

### B.  The Court Will Assume that it Should Evaluate OPM's Interpretations of the Carrier Contract under a Deferential Standard of Review

The next question the Court must decide is what standard of review to apply to OPM's interpretations of the carrier contract.  OPM says the Court should consider its interpretations under a deferential framework.  *See* ECF No. 44 at 14 n.5.[14]  Under the relevant caselaw, OPM is likely correct.  But as the Court will explain, it cannot defer to OPM's interpretations even under a deferential standard of review.  So it will assume without deciding that a deferential standard of review applies.

In this Circuit, courts should usually defer to agency interpretations of contracts if the contract's subject matter lies inside the agency's regulated area.  *See Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1568–72 (D.C. Cir. 1987); *Bolack Minerals Co. v. Norton*, 370 F. Supp. 2d

---

[14] Admittedly, OPM's position on this point is opaque.  In response to Plaintiff's argument for de novo review, OPM "does not dispute that the Court reviews questions of law and issues outside of an agency's expertise *de novo*."  ECF No. 44 at 14 n.5.  But it says its regulations and the carrier contract "are areas within [its] expertise" and that the relevant language contains "no ambiguity."  *See id.*  Presumably, it intended those statements to mean that deference is appropriate or, at least, unnecessary to resolve this dispute.  In any event, an agency cannot forfeit the standard of review by its "litigation conduct."  *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1239 (D.C. Cir. 2020).

161, 175 (D.D.C. 2005).[15]  That is particularly appropriate if the contract incorporates the agency's power to modify or construe its terms.  *See Indep. Petrol. Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039 (D.C. Cir. 2002).  Such deference uses a framework much like that of the now-defunct *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Williams Nat. Gas Co. v. FERC*, 3 F.3d 1544, 1549–51 (D.C. Cir. 1993).  The first question is whether the contract is ambiguous.  *See id.*  If it is, the reviewing court proceeds to the second question— whether the agency has reasonably construed it.  *See id.*[16]

　　To begin, in this Court's view, it remains bound by *Williams*.  Although the Supreme Court overturned *Chevron* in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the deference doctrine described by the D.C. Circuit in *Williams* is distinct from *Chevron*.  *Chevron* applied to agency interpretations of ambiguous statutory provisions.  But the standard discussed in *Williams* applies to agency interpretations of ambiguous *contracts*.  Justices have recognized the distinction between the two.  *See, e.g.*, *Scenic Am., Inc. v. DOT*, 583 U.S. 936 (2017) (statement of Gorsuch, J., respecting the denial of certiorari) (questioning whether "*Chevron*-type deference" should apply to contract interpretation).  So even if *Williams'* rationale were based on *Chevron*,

---

[15] Some courts have recognized a limit to this principle where an agency's contract interpretation may be "self-interested."  *See, e.g.*, *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 280–81 (D.D.C. 2021).  That principle is irrelevant here—OPM has no direct financial interest in the outcome of coverage disputes between enrollees and carriers.

[16] Cases such as *Mesa Air Group, Inc. v. DOT*, 87 F.3d 498 (D.C. Cir. 1996), present a different situation.  In those cases, the contract itself is the agency action under review.  *See id.* at 503.  There, courts apply "the neutral principles of contract law, not the deferential principles of regulatory interpretation." *Id.*  Here, the Court is reviewing separate informal adjudications that interpret the carrier contract.  Whether the product of an informal adjudication is entitled to *Chevron* deference depends on the application of the factors laid out by the Supreme Court in *Barnhart v. Walton*, 535 U.S. 212, 221–22 (2002) and the Circuit in similar cases.  *Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018).  At this stage, the Court may assume that all those factors support deferential review because the agency's action cannot be upheld even then.

the Court may not disregard it.  True, "[c]ontrolling precedent may be 'effectively overruled' . . . if a later Supreme Court decision 'eviscerates' its reasoning," *Brookens v. Acosta*, 297 F. Supp. 3d 40, 47 (D.D.C. 2018) (quoting *Perry v. MSPB*, 829 F.3d 760, 764 (D.C. Cir. 2016), *rev'd on other grounds*, 582 U.S. 420 (2017)).  But that high standard has not been met here.  *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("[A] lower court 'should follow the case which directly controls' . . . even if the lower court thinks the precedent is in tension with 'some other line of decisions.'" (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989))). [17]

Still, the general principle that agencies' contractual interpretations may be entitled to deference does not answer the question whether to defer to OPM's interpretations here.  The first step in answering that question is deciding whether the interpretations came in a form eligible to receive deference.  *See, e.g.*, *United States v. Harmon*, 514 F. Supp. 3d 47, 57–61 (D.D.C. 2020).  Because OPM's decisions were, in APA terms, informal adjudications,[18] whether they are entitled to deference is "a murky question in this Circuit."  *Cavazos v. Haaland*, 579 F. Supp. 3d 141, 151 (D.D.C. 2022).  The answer depends on the balancing of various factors, which come from the Supreme Court's decision in *Barnhart v. Walton* and multiple decisions of the Circuit.  *See Fox v. Clinton*, 684 F.3d 67, 77–78 (D.C. Cir. 2012).  Those factors include:

> [1] the interstitial nature of the legal question, [2] the related expertise of the [a]gency, [3] the importance of the question to administration of the statute, [4] the

---

[17] Plaintiff also advances a few other arguments that as a general rule, the Court should not defer to an agency's interpretation of a contract, but they can be brushed aside as misstating the law of this Circuit or relying on out-of-circuit caselaw.  *See* ECF No. 39 at 21.

[18] The FEHBA gives OPM the power to "find[ ] that [a covered person] is entitled [to coverage] under the terms of the [carrier] contract."  5 U.S.C. § 8902(j).  That process cannot be a formal adjudication because the statute does not require it to be made "on the record after opportunity for an agency hearing."  *See Accrediting Council for Indep. Colls. & Schs. v. DeVos*, 303 F. Supp. 3d 77, 110 n.11 (D.D.C. 2018) (quotation omitted); *see also* 5 U.S.C. § 554(a).

complexity of that administration, . . . [5] the careful consideration the [a]gency has given the question over a long period of time[,] . . . [6] [whether the] interpretation . . . was offered in an exhaustive adjudicative decision, . . . [7] [whether] the agency was acting pursuant to an express delegation from Congress[, and] . . . [8] [whether] the agency's judgment reflected a longstanding agency policy.

*See id.* (cleaned up).  None of those factors appears to be dispositive; they are merely "qualities that might justify *Chevron* deference in the absence of a formal adjudication or notice-and-comment rulemaking." *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1137 (D.C. Cir. 2014).

Some of those factors point in different directions here, but on balance, they seem to favor applying a deferential standard.  The most significant factor is that OPM interprets the carrier contract under an express delegation from Congress.  *See* 5 U.S.C. § 8902(j).  The FEHBA and its implementing regulations also create a complex administrative scheme, and the agency has expertise in administering that scheme.  And the contracts the statute empowers the agency to enter, interpret, and administer have the force of law.  *See id.* § 8902(m).  So on the whole, it appears that when the agency bases its decision on review of a denied claim on an interpretation of a carrier contract, those decisions are "intended to carry the force of law," *Cavazos*, 579 F. Supp. 3d at 152. As a result, such interpretations should be likely evaluated under the framework recognized by *Williams*.

In the end, though, the Court need take no final position on the standard of review and will assume that the deferential framework described in *Williams* applies.  That is because, as explained below, it cannot defer to either of OPM's relevant contractual interpretations in any event—in one instance, that is because the contract is unambiguous; in the other, it is because the interpretation is inadequately explained.[19]

---

[19] Plaintiff also argues that the claims here are subject to a "procedural irregularity" exception to deferential review of a benefit determination.  ECF No. 39 at 21–22.  But for the reasons explained, the Court also need not wade into whether such an exception exists or whether it applies

### C.    OPM Reasonably Concluded that Plaintiff Is the Assignee of Only Patients B and G

The first set of OPM's decisions that Plaintiff challenges are its determinations that patients for whom Plaintiff has never received authorization on an approved form—Patients A, C, D, E, F, H, and I—have not validly authorized Plaintiff to pursue their claims.  *See* ECF No. 39 at 22–27.  OPM explains that, under the carrier contract, no assignment is valid unless it happens by an approved form.  *See* ECF No. 37-1 at 23–25.

Apart from its argument that the carrier contract cannot abrogate (its interpretation of) the statement of plan benefits, a position the Court has already rejected, Plaintiff advances four contrary arguments.  First, it says, "the decision to assign benefits or to designate an authorized representative belongs to the beneficiary."  ECF No. 39 at 24 (emphasis omitted).  Second, it argues that beneficiaries cannot, in any event, be bound by this term of the carrier contract because they are not parties to that contract.  *Id.*  Third, it claims several federal regulations prevent this restriction on assignments.  *See id.* at 24–25.  Fourth, it thinks enforcing the limitations on assignments would "have negative consequences on our health care system."  *Id.* at 26.

For the following reasons, each of those arguments is unpersuasive.  The first step in evaluating OPM's interpretation of the contract is to "review *de novo* the question whether [the contract is] ambiguous."  *See Williams Nat. Gas Co.*, 3 F.3d at 1551.  On this point, the contract is clear, so the Court need go no further.

The carrier contract establishes two important limitations.  First, plan benefits "are not assignable . . . without express written approval of the carrier."  AR B373.  Second, "in the absence of such approval, any such assignment shall be void."  *Id.*  The "plain meaning" of those terms,

---

here.

*see Hensel Phelps Constr. Co. v. Cooper Carry Inc.*, 861 F.3d 267, 272 (D.C. Cir. 2017) (quotation omitted), is obvious: No matter what any patient has purported to do, no assignment has effect unless CareFirst—the carrier—expressly approves it in writing.

Notably, Plaintiff does not contend that Patients A, C, D, E, F, H, or I executed an assignment with CareFirst's express written approval. So under the carrier contract, the Court has no basis to deem its refusal to adjudicate those claims arbitrary and capricious. Under that standard of review, the Court must "presume[ ]" OPM's decision was "valid." *See In re Bolden*, 848 F.2d at 205. And it can "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 74 (D.C. Cir. 2021) (quotation omitted). Under the applicable legal principles as the Court has explained them, Plaintiff says nothing on that score.

Plaintiff's remaining collateral attacks on the anti-assignment provision lack merit. Its argument that the patients cannot be bound by a contract to which they are not parties misunderstands the patients' relationship to the carrier contract. The patients, as the Court has already explained, are third-party beneficiaries of the carrier contracts, *Christiansen*, 683 F.2d at 533, which is why they can enforce its terms at all, *see Ashton*, 716 F.2d at 66. Thus, the patients are "bound by the terms and conditions of the contract" and "cannot accept [its] benefits and avoid [its] burdens or limitations." *Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976). And as the sole case on which Plaintiff relies for this argument recognizes, *see* ECF No. 39 at 24, a limitation on assignment is enforceable against a putative assignee. *See ABB Daimler-Benz Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp.*, 14 F. Supp. 2d 75, 84 (D.D.C. 1998) (holding that a putative assignee could not sue Amtrak because "the [c]ontract [between Amtrak and the putative assignee] . . . specifically prohibits any such assignment of rights without Amtrak's

consent").

Plaintiff also fails to establish that this contractual term runs afoul of any regulation.  It cites 5 C.F.R. § 890.105(a)(2) and 29 C.F.R. § 2560.503-1(b)(3)–(4).  *See* ECF No. 39 at 24–25.  The first provision notes only that the procedures for filing a claim apply to "individuals or entities who are acting on the behalf of a covered individual and who have the covered individual's specific written consent to pursue payment of the disputed claim."  5 C.F.R. § 890.105(a)(2).  The second provision forbids plan administration that "unduly inhibits or hampers the initiation or processing of claims."  29 C.F.R. § 2560.503-1(b)(3).  And the third says procedures cannot "preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal."  *Id.* § 2560.503-1(b)(4).

None of those regulations says anything that pertains to the question answered by the carrier-contract provision:  How can one *become* an authorized representative?  The first and third regulations presuppose that a person or entity is "acting on the behalf of a covered individual," 5 C.F.R. § 890.105(a)(2)—that is, the person or entity is an "an authorized representative," 29 C.F.R. § 2560.503-1(b)(4).  Thus, they do not forbid a contractual term that regulates how to obtain authorization.  And the second regulation forbids only administrative hurdles that are "undu[e]."  *See* 29 C.F.R. § 2560.503-1(b)(3).  Plaintiff barely attempts to explain why the carrier contract unduly burdens claims processing, noting only that it "elevates form over substance."  *See* ECF No. 39 at 25.  But the Court can imagine ample substantive justification for policing how a patient can assign her plan benefits—preventing fraud, to name only one.  At bottom, Plaintiff has not adequately explained why this regulation nullifies the contractual term OPM approved.

Finally, Plaintiff's policy argument is unavailing.  "Policy arguments are properly addressed to Congress"—or, in this case, perhaps OPM—"not this Court."  *See SAS Inst., Inc. v.*

*Iancu*, 584 U.S. 357, 368 (2018).  This Court must evaluate OPM's determinations under the contract as written.[20]  Because Plaintiff has not shown that OPM's refusals to adjudicate its claims related to Patients A, C, D, E, F, H, and I, were arbitrary and capricious, the Court will grant summary judgment for OPM on the sole count of Plaintiff's complaint insofar as it asserts those claims.

### D.   OPM Inadequately Explained Why and How It Applied the Terms of Any Pilot Program to Patients B's and G's Claims

The rest of Plaintiff's claim presents a different story.  Given that the Court has held that the carrier contract's terms control, Plaintiff has three remaining arguments.  First, it says OPM failed to explain on the record why and how the terms of any pilot program apply to the claims of Patients B and G.  *See* ECF No. 39 at 34–35.  Second, it argues that any such program violates "federal anti-discrimination laws."  *See id.* at 35–36.  Third, it claims, "as a matter of policy," that the pilot program is undesirable.  *See id.* at 36–37.  After careful consideration of the administrative record, the Court agrees with Plaintiff's first contention.  Thus, it does not reach the other two.

Again, the first step is to "review *de novo* the question whether [the contract is] ambiguous."  *See Williams Nat. Gas Co.*, 3 F.3d at 1551.  In this respect, it is.  The contract says a pilot program should "test the feasibility and examine the impact of various managed care initiatives."  *See* ECF No. 44-2 at 10.  The provision's heading also alludes to a pilot program's role—"cost containment."  *See id.* (capitalization altered).  But beyond that, the provision describes only the procedures for "design[ing]," "implement[ing]," and "evaluati[ng]" such programs.  *See id.*

---

[20] The Court here uses the term "determinations" in a non-technical tense.  OPM argues that Plaintiff's failures to obtain authorizations to pursue these claims mean that it has never rendered "final agency decisions," a condition of this Court's review.  *See* ECF No. 37-1 at 25.  Plaintiff disagrees.  *See* ECF No. 39 at 19–20.  The Court need take no position on this question because it has determined that it must grant summary judgment for OPM in any event.  The question is not jurisdictional.  *See Trudeau v. FTC*, 456 F.3d 178, 183–84 (D.C. Cir. 2006); 5 U.S.C. § 8912.

But the relevant question is whether the contract is "ambiguous with respect to the specific issue" before the Court. *See Chevron*, 467 U.S. at 843. And the specific issue before the Court is whether Patients B's and G's claims were paid correctly, as OPM determined, under the terms of "the CareFirst dialysis pilot." *See* AR B535; AR G338. The contract could not possibly answer that question because it mentions no such pilot program, let alone define its terms. For purposes of this case, then, it is ambiguous. *See, e.g.*, *W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1173 (D.C. Cir. 2000).

That conclusion leads to step two, when the Court asks whether OPM's construction is reasonable. *See Williams Nat. Gas Co.*, 3 F.3d at 1551. Reasonableness means, in part, that the interpretation "reflect[s] reasoned and principled decisionmaking that can be ascertained from the record." *See id.* (quotation omitted). Another way to put that question is whether the "agency interpretation is arbitrary or capricious in substance." *Pharm. Rsch. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 209 (D.C. Cir. 2015) (quotation omitted). Thus, where the challenge to agency action is based on the correctness of its legal interpretation, not its application of that interpretation to the record or its failure to consider an aspect of the problem, the questions of whether the agency's interpretation is reasonable and whether it has acted arbitrarily and capriciously are "the same." *See Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017) (quotation omitted).

A critical component of that review is that the agency has "articulate[d] a satisfactory explanation." *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (quotation omitted). That standard sets a "low bar." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377 (D.C. Cir. 2013). Even an explanation with "less than ideal clarity" is sufficient if the Court can "reasonably discern the agency's path." *Id.* at 376–77 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)) (alteration adopted). The Court must attempt to do that based on "the

administrative record as a whole." *See Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 58 (D.D.C. 2014).  But there must be a "path to follow."  See *United Steel Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 90 (D.D.C. 2015).

No such path appears here.  OPM's laconic explanation merely hints at some bases of its decision.  It approved at least one pilot program effective in 2015.  *See* AR B535; AR G338.  That program seemingly applies to "dialysis" provided by "CareFirst."  *See id.*  Under the program, the plan allowance is not the "billed charges" but the "Local Plan Allowance," presumably a lower amount.  *See id.*  CareFirst paid 65 percent of "the NPA," *see* AR B536; AR G339, an initialism the record separately defines as the "Non-participating Provider Allowance," *see* AR B525.

The letters CareFirst sent to Patients B and G and Plaintiff tell a similar story.  CareFirst said to the patients that, instead of the billed amount, it would base reimbursement on its "allowance for the services rendered."  *See* AR B335; AR G341.  It also suggested that allowance would likely be lower than the billed amount.  *See id.*  But it did not say how that allowance would be determined.  *See id.*  To Plaintiff, it said even less—that reimbursement would occur "according to the CareFirst non-participating provider fee schedule," not "billed charges."  *See* AR G344.

It bears emphasizing that the question before the Court is not whether the contract permits a pilot program that reduces the applicable plan allowance.  The question is much more specific. In the relevant period, Plaintiff billed Patient B $545,525.76.  *See* AR B1–2.  CareFirst determined that the plan allowance was $73,506.25.  *See id.*[21]  It paid $47,798.87.  *See id.*  Similarly, Plaintiff billed Patient G $5,598.46.  *See* AR G1.  CareFirst determined that the plan allowance was

---

[21] The individual payments reveal little about the relationship between the plan allowance and the billed amount.  Most of CareFirst's calculations of the plan allowance are between about 12 and 13 percent of the billed amount.  *See* AR B1–2.  But the precise ratio is different for nearly every claim, and in two instances, the calculated plan allowance was the billed amount.  *See id.*

$688.06.  *See id.*[22]  It paid $447.29.  *See id.*  And it is those calculations that OPM determined "were paid appropriately."  *See* AR B536; AR G339.

Chasms in OPM's explanation prevent the Court from assessing that determination.  For starters, what were the terms of the pilot program?  How did CareFirst and OPM determine that Patients B and G were subject to the pilot program?  How did they determine that the pilot program encompassed outpatient dialysis services?  What is the local plan allowance?  How does that figure relate to the non-participating provider allowance?  And how are those figures calculated?

None of the answers to those questions appears in the record.  Of course, only the grounds for a decision that appear in the record are ultimately relevant here, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), but it is remarkable how little even OPM's briefing fails to illuminate.  Its first brief says the pilot program "changed the reimbursement scheme applicable to Patient[s] B . . . [and] G."  *See* ECF No. 37-1 at 22–23.  Its second brief said the change in reimbursement "was the result of a pilot program" and quoted the letters sent to Patients B and G.  *See* ECF No. 44 at 11–12.  As an exhibit to that brief, it also introduced, *for the first time*, the contractual language that purportedly authorized pilot programs.  *See* ECF Nos. 44-1–44-2.  And its third brief explains that the "pilot program changed the reimbursement level from the billed charges to the Local Plan Allowance."  *See* ECF No. 47 at 9–10.  Thus, OPM seems to expect the Court to trust that the unknown terms of a pilot program it says it approved apply to Patients B's and G's claims in precisely the unexplained way CareFirst calculated the benefits due.

But blind faith is not an APA principle.  After all, it is the "interpretation" of the plan terms, that is, the "proper construction of language," to which the Court must defer if reasonable.  *See*

---

[22] Again, the individual payments add little clarity.  Patient G's claim arises from one day. *See* AR G1.  For seven of the eight itemized charges, CareFirst's calculation of the plan allowance is 15 percent of the billed amount, but for the largest charge, it is roughly 11.5 percent.  *See id.*

*FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 446 (D.C. Cir. 2005) (quotation omitted). Here, there is no pertinent language in the record, and so no way for the Court to understand and evaluate OPM's interpretation.  There is, in other words, "nothing to which the court can defer." *Thompson v. J.C. Penney Co.*, No. 00-3504, 2001 WL 1301751, at *4 (6th Cir. Aug. 7, 2001) (noting that an ERISA plan administrator had "never offer[ed] an interpretation of the plan language").

For the same reason the Court cannot defer to OPM's construction of the carrier contract or plan terms found elsewhere, OPM's adjudications of Patients B's and G's claims were arbitrary and capricious on the record before it.  The record lacks an explanation "sufficient to enable [the Court] to conclude that the agency's action[s] [were] the product of reasoned decisionmaking." *See Kelly v. United States*, 34 F. Supp. 2d 8, 14–15 (D.D.C. 1998) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir.1995)) (alteration adopted).  An agency's explanation cannot contain an "unexplained leap," *see Sw. Power Pool, Inc. v. FERC*, 736 F.3d 994, 998 (D.C. Cir. 2013)—and here the explanations discernible from the record contain more than one.  It may be, as OPM argues, that "there is a rational connection between the applicable regulations and OPM's decision[s]," ECF No. 37-1 at 22–23, but if so, the Court does not know what it is.

That conclusion leaves the question of remedy.  The APA directs Courts, upon a finding that agency action is arbitrary and capricious, to "hold [it] unlawful and set [it] aside."  5 U.S.C. § 706(2).  Regulations that implement the FEHBA also provide that the "recovery" "shall be limited to a court order directing OPM to require the carrier to pay the amount of benefits in dispute." 5 C.F.R. § 890.107(c).  But Plaintiff has not proven that, on behalf of Patients B and G, it is entitled to the disputed benefits.  Nor could it, because Plaintiff, like the Court, cannot access what OPM says are the relevant plan terms.

In such circumstances, "[t]he norm is to vacate agency action . . . and remand for further proceedings consistent with the judicial decision[] without retaining oversight over the remand proceedings." *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008). The Court sees no reason to depart from that norm here. The regulatory remedies limitation applies only to "recovery"—that is, a monetary award. *See* 5 C.F.R. § 890.107(c). It does not mean that the sole remedy available is such a monetary award. Because the Court's review here occurs under the APA standard of review, *see In re Bolden*, 848 F.2d at 205, the APA remedy of vacatur and remand is appropriate.

Thus, the Court the Court will grant summary judgment for Plaintiff on the sole count of the complaint insofar as it asserts claims on behalf of Patients B and G, vacate OPM's adjudication of those claims, and remand to OPM for further proceedings consistent with this opinion.

### E.   Plaintiff Has Not Shown that the Material It Seeks to Add to the Administrative Record is Adverse to OPM's Decision

Finally, Plaintiff also moves to supplement the administrative record. ECF No. 38. It seeks to add material that it describes as excluded patient records, mostly those of Patients A, C, D, E, F, H, and I, correspondence with OPM and CareFirst, excerpts from the 2016 statement of plan benefits, and "[c]laim forms." *See id.* at 10–12. It argues that all that information was before OPM when the agency made the determination under review, which means the Court should consider it too. *See id.* at 8–10. OPM opposes the motion. *See* ECF No. 42. It argues that records pertaining to patients A, C, D, E, F, H, and I should not form part of any administrative record because "there was no final agency decision for any of these [p]atients." *See id.* at 5–8. OPM says the remaining documents are duplicative or irrelevant. *See id.* at 10–23.

The administrative record compiled by OPM is "entitled to a presumption of administrative regularity." *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (quotation omitted). Plaintiff

can rebut that presumption by "clear evidence to the contrary." *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005). Fair judicial review requires that the Court has "neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp.*, 749 F.2d at 792. But Plaintiff must show "that the additional information was known to the agency when it made its decision, the information directly relates to the decision, and it contains information adverse to the agency's decision." *Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 72 (D.D.C. 2008).

Plaintiff fails on the last score. As the Court found above, the only documents that would be adverse to OPM's decisions about Patients A, C, D, E, F, H, and I, are written authorizations executed with CareFirst's "express written approval." AR B374. And the only documents that would be adverse to OPM's decisions about Patients B and G are documents showing that, under the terms of an applicable pilot program, those patients were entitled to more benefits than Care-First paid. Plaintiff does not represent that its proposed additions to the administrative record include such documents.

Thus, the Court will deny the motion. It has referenced some of the documents in Plaintiff's proposed additions to the administrative record, *see generally* ECF Nos. 50-1, 50-5–50-8, 50-10–50-11, but solely to explain the scope of the parties' dispute. None of the documents provided is material to the Court's legal analysis.

## IV.    Conclusion

For all the above reasons, the Court will grant Defendant's Motion for Summary Judgment, insofar as it seeks judgment on Plaintiff's claims related to Patients A, C, D, E, F, H, and I, and deny it in remaining part. The Court will grant Plaintiff's Motion for Summary Judgment, insofar as it seeks judgment on Plaintiff's claims related to Patients B and G and deny it in remaining part. The Court will vacate the OPM's adjudication of Patients B's and G's claims and remand those

claims to the agency for further proceedings consistent with this opinion.  The Court will also deny

Plaintiff's Motion to Supplement the Administrative Record.

     A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 7, 2024